IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KATIE SAGAITIS,

      Plaintiff,

  v.                OPINION and ORDER

WEST BEND INSURANCE COMPANY, fka     25-cv-18-jdp
WEST BEND MUTUAL INSURANCE CO.,

      Defendant.

---

Plaintiff Katie Sagaitis worked in various capacities for West Bend Insurance Company from 2000 until she resigned in 2020. Sagaitis contends that West Bend discriminated against her because she is a woman and retaliated against her for complaining about it, in violation of Title VII of the Civil Rights Act of 1964.

Sagaitis and West Bend have very different views about how West Bend treated her as well as other female employees. Sagaitis says that West Bend excluded women from upper management positions and required her to perform the work of a director without giving her commensurate pay despite paying similarly situated men more than her. She also says that West Bend denied her a promotion and removed her job responsibilities when she complained about unequal treatment and ultimately threatened to fire her when she did not stop complaining. West Bend denies all of this, saying that it treated Sagaitis *more* favorably than other employees, creating a new position when hers was eliminated and giving her larger than average raises each year. West Bend also denies threatening to fire her.

West Bend moves for summary judgment on all of Sagaitis's claims. Dkt. 23. Some of Sagaitis's arguments fall outside the claims raised in her complaint, and some of them are not supported by evidence from which a reasonable jury could find in her favor. So the court will

grant summary judgment to West Bend on those claims. But the court will deny West Bend's summary judgment motion on Sagaitis's claim that she was denied a promotion because of her sex in 2020. Sagaitis has adduced evidence that she was qualified for the promotion, but West Bend denied her the opportunity to even apply, despite knowing that she had repeatedly expressed interest in a promotion. West Bend instead gave the position to a man for vague reasons that a reasonable jury would not have to accept. Sagaitis is entitled to a trial on that claim.

## BACKGROUND

### A. Problems with the proposed findings of fact

Determining the undisputed facts in this case was more difficult than usual because nearly all of Sagaitis's proposed findings of fact violated this court's summary judgment procedures. The proposed facts had three key problems: (1) they combined numerous factual propositions into a single paragraph; (2) they included arguments and interpretations of the evidence; and (3) many of the propositions were not directly supported by the record. A review of the court's procedures should have made it clear that Sagaitis's proposed findings were inconsistent with those procedures. *See* Motions for Summary Judgment I.B.3, attached to Dkt. 14 ("A party must propose each fact in a separate, numbered paragraph, limited as nearly as practical to a single factual proposition."); *id.* at 1 ("The fact documents should not be inflated with lengthy argument."); *id.* I.B.4 ("Each factual proposition must be followed by a reference to evidence supporting the proposed fact.").

Sagaitis's first proposed finding of fact provides an example of the problems:

> **West Bend Promised Salary Restoration.** When Sagaitis accepted the reduced salary in 2017, Klein promised her that he

2

would restore her compensation to what she previously earned. John Reyzer made a similar promise in 2019. Neither promise was kept. Sagaitis relied upon these promises. Plaintiff's compa-ratio never reached above 94% during her entire tenure as Senior Product Manager. Civil Docket Number, (hereinafter referred to as "Dkt."), Dkt. 27, Klein Dep. 45:19-46:6; Dkt. 32, Reyzer Dep. 28:9–16; 29:3–16; Exhibit 5.

Dkt. 38, ¶ 1. This paragraph includes at least six propositions, some of which are more accurately characterized as conclusions or arguments. The cited portion of the Gary Klein deposition is testimony that he "probably indicated that over time we would try to get [Sagaitis] back to her salary." The cited portion of the John Reyzer deposition is testimony that Sagaitis wanted an increase in pay, and Reyzer told her, "[T]his is what we can do now, and I'm hoping that we can do more in the future." Sagaitis did not file a document called "Exhibit 5." The cited testimony includes no mention of a promise, of whether any promise was kept, of whether Sagaitis relied on such a promise, or of what Sagaitis's "compa-ratio" was (or what that even means). So the cited evidence does not directly support most of the proposed finding of fact. Similar problems proliferated across the rest of Sagaitis's proposed findings of fact.

Lengthy paragraphs followed by string citations should be a red flag. If counsel cannot find a single piece of evidence that supports his factual proposition, that is a strong indicator that counsel must narrow the proposition. Generally, proposed findings of fact should not be supported by a string of citations that have to be combined to support different aspects of the same proposition.

The purpose of proposed findings of fact is to assist the court with identifying disputed and undisputed facts. Motions for Summary Judgment, § I.B.1. For this reason, it is important that parties propose discrete facts that are directly supported by specific evidence and are free

3

from argument or interpretation. A party should craft proposed findings of fact to try to eliminate disputes, not provoke them. It is not helpful to the court when parties treat their proposed findings of fact as just another brief to argue their case. Doing so guarantees the result here, which was repeated (and reasonable) objections from the opposing party that the evidence did not support the factual proposition. This requires the court to individually review each piece of cited evidence (which, in this case, was often part of a string citation) to determine what the evidence actually shows. That defeats the purpose of proposed findings of fact, which is to streamline the factfinding process rather than make it more contentious.

Sagaitis's responses to West Bend's proposed findings of fact had a different problem, which is that they were often nonresponsive, adding facts without providing a genuine basis for disputing the factual proposition. Her response to West Bend's proposed finding of fact 93 provides one example:

> Plaintiff's 6.5% salary increase was higher than the standard annual salary increases, and was higher than the salary increases Plaintiff recommended for the two associates who reported to her. (EXHIBIT C - Sagaitis II Dep. 69:15–70:2.)
>
> **RESPONSE:** Disputed
>
> This is misleading. Despite above-average percentage raise, Plaintiff's compa-ratio was brought only to 94%, the target for less experienced or poor performing employees. Her raise did not bring her to the 111%+ she was entitled to as a consistent above-expectations performer with over 20 years of experience. At the same time, Brent Haffenbredl a male employee under Reyzer with one year of experience at the company, no direct reports and no leadership duties, received a raise that brought him to 108.6% of corporate value. (Exhibit A_Katie Sagaitis Declaration_#13; Exhibit Q_WB0000048_Historical Compa Ratio; Exhibit S_WB0000392_209 and 210 Salaries - CONFIDENTIAL; Dkt. 32_Reyzer Dep. 90.22-96.6; Dkt. 27_Klein Dep. 50.22-51.7; 59:23–60:4)

4

Dkt. 37. Sagaitis did not actually dispute the substance of West Bend's proposed fact but instead provided new information that would have been more appropriate in one of Sagaitis's own proposed findings of fact. The court did not consider responses that went beyond the scope of the proposed fact.

The problems with Sagaitis's own proposed findings of fact were so prevalent that the court considered whether to simply strike them and require Sagaitis to start over. But the number of proposed findings of fact was relatively small in this case, and a do-over would require striking the schedule. So the court considered Sagaitis's factual propositions to the extent they were supported by the record.

But the problems with Sagaitis's proposed findings of fact were so systemic that it suggests that Attorney Porter has a fundamental misunderstanding of the court's summary judgment procedures, so he must carefully review those procedures before submitting proposed findings of fact or responses in this court in other cases. In addition, when preparing his summary judgment submissions, he should confirm the following things: (1) neither his proposed findings of fact nor responses to proposed findings of fact include factual or legal argument; (2) each of his proposed findings of fact is directly supported by the evidence he cited; (3) he has not included any compound facts; and (4) his responses to the opposing party's proposed findings of fact address the substance of the factual proposition without including new information that is not directly responsive. If future submissions from Attorney Porter continue to violate the court's summary procedures, the court will consider whether sanctions are warranted, including striking the offending document or documents, without giving leave to refile them.

With the understanding that the court will consider Sagaitis's factual propositions only where supported by the record, the court will proceed to a summary of the background facts.

## B. Factual background

As will be discussed in the analysis section, Sagaitis's brief focus on the following events: (1) the decision to eliminate her position in 2017; (2) her salary after she was demoted to a new position, especially as it compared to Adam Vander Weerdt and other male employees; (3) the responsibilities she had in the new position, especially as they compared to the responsibilities of male employees; (4)  the decision in 2020 to give Chris Kapfer the Director of Business Development position and then to give some of her responsibilities to him; and (5) the circumstances surrounding her decision to resign from West Bend in May 2020. The court will focus on those issues in this section.

The facts below are not genuinely disputed except where noted.

### 1. Hiring, promotion, and demotion

In 2000, West Bend hired Sagaitis as an underwriter. By 2009, she had received several promotions and was the Director of NSI Development. "NSI" is an abbreviation for National Specialty Insurance. The NSI division offered insurance and bond programs to approximately 25–30 niche businesses. West Bend also had a Commercial Lines division, which included general property casualty insurance.

In 2014, West Bend promoted Sagaitis to Director of Enterprise Product Support. In 2017, West Bend eliminated the Enterprise Product Support department, along with Sagaitis's position. At Sagaitis's request, West Bend created a new, "unbudgeted" position for Sagaitis in the NSI division, giving her the title of Senior Product Manager. The position paid $100,000, which was $24,000 less than what Sagaitis was then being paid. In this new position, Sagaitis

performed work for the product development department with the NSI division and the corporate product compliance department with the Commercial Lines division.

As Senior Product Manager, Sagaitis job's responsibilities included "creat[ing] and maintain[ing] NSI insurance products, review[ing] ISO circulars, adopt[ing] changes to forms and rates, create[ing] new forms and rates, and review[ing] programs to determine whether changes to coverage needed to be made based on market trends." Dkt. 43, ¶ 43. Sagaitis also supervised other employees. Sagaitis was part of the NSI Executive Leadership team, which engaged in strategic planning and divisional budgeting, among other things.

In 2017, Gary Klein, Vice President of NSI, was Sagaitis's direct supervisor. In 2018, Sagaitis started reporting to John Reyzer, Vice President-Finance of NSI. Later that year, Sagaitis's position became exclusively focused on NSI product development, but she retained the same title. Her responsibilities included the following:

- serving as the direct supervisor of one associate in the NSI product development department;[1]

- overseeing the NSI product development department budget;

- hiring and firing associates in the NSI product development department; and

- participating in division-wide planning.

## 2. Evaluations and pay increases after demotion

In February 2019, Reyzer conducted Sagaitis's performance review for 2018, finding that Sagaitis met or exceeded all of her performance objectives in 2018. She initially received

---

[1] In other parts of their proposed findings of fact, the parties agree that Sagaitis had two employees reporting to her. Dkt. 43, ¶ 110. They do not acknowledge the discrepancy, but the court need not resolve it because it does not affect the outcome of the summary judgment decision.

a three percent raise, but after she complained that was too low, West Bend approved a seven percent raise, which was a larger percentage than what most employees received. When Sagaitis complained that the increase was still too small and her job title did not reflect her level of responsibility, Reyzer told Sagaitis that "he would look into changing her job title and pay in the next round of budgeting for the following year." Dkt. 43, ¶ 83.

In February 2020, Reyzer conducted another performance review of Sagaitis, and he found that she met or exceeded all of her performance objectives for 2019. West Bend initially approved a three percent raise, but when Sagatis complained, West Bend increased that raise to 6.5 percent, which was higher than average. Sagaitis was still dissatisfied and asked Reyzer why she did not have the same title and pay as "a guy like Vander Weerdt." Dkt. 36 (Sagaitis Dep.71:9–19). Adam Vander Weerdt held the title of Manager of Product Management in the Commercial Lines division while Sagaitis was Senior Product Manager in the NSI division. Vander Weerdt reported to Rob Jacques, the Vice President of Commercial Lines. Vander Weerdt had a salary grade of 210 (Sagaitis's was 209), and his initial salary was $140,000. (The parties do not say what Sagaitis's salary was by 2020.)

### 3. Creation of Business Development unit

In March 2020, Reyzer announced the creation of a new unit in the NSI division called Business Development. Mike Kapfer would be the director of the department. Previously, Kapfer had been Assistant Vice President-Underwriting, and the new position represented a demotion for him. West Bend did not post the position or otherwise seek applications for it.

The responsibilities of the Director of Business Development included overseeing the Product Development department of the NSI division and "drumming up business to grow

NSI's programs by traveling across the United States to insurance agents to discuss their potential needs." Dkt. 43, ¶ 104.

Both Sagaitis and her team would report directly to Kapfer after the restructuring, so Sagaitis would no longer have employees reporting to her. According to Reyzer, this was done to avoid creating another level of management. Dkt. 32 (Reyzer Dep. 47:8–24). Also, Sagaitis would no longer participate in executive leadership team meetings.  Sagaitis's title, pay, bonus target, and schedule remained the same.

### 4.  Sagaitis's response to the restructuring

In response to the announcement about the restructuring, Sagaitis asked Reyzer to clarify the scope of her and Kapfer's responsibilities, especially as they related to supervising other employees. In his response, Reyzer wrote that he would clarify the reporting structure to all employees involved, and that Sagaitis could still field questions in the manager's absence, coordinate team efforts, and influence the team even without direct authority. Reyzer asked Sagaitis what role she "would like to play within the new team dynamics." Dkt. 26-17, at 2. Sagaitis wrote back that she "still desire[s] to lead, manage and mentor [her] team and other associates, just [as she has] always done." *Id.* at 1. But she also wanted "some clarification on the role [Reyzer], [Jacques], and [Kapfer] see [her] playing." *Id.* Reyzer wrote that they could talk more when he returned from vacation.

In an April 29 email to Reyzer, Sagaitis expressed confusion about why she was not considered for the Director of Business Development position. She also questioned why she had been performing the duties of director without the title, why her salary was not consistent with the company's recommended salary range for her position, and why Adam Vander

Weerdt, whom she described as her "counterpart in commercial lines" had a manager title, but she did not. Dkt. 39-3.

The same day, Sagaitis accepted a job offer with Church Mutual Insurance. She did not immediately disclose this to anyone at West Bend,

On April 30, Reyzer suggested a telephone conversation to address Sagaitis's concerns, and he asked Sagaitis to clarify "what outcome(s) [Sagaitis] hope[d] to achieve from the discussion" because he wanted to "focus on moving forward." Dkt. 39-5, at 2. In a May 1 email to Reyzer, Sagaitis repeated questions about why she was not considered for the role of Director of Business Development, why she did not receive the pay and title for the job she was performing, and why she was "not given the same opportunities" as Mike Kapfer and Adam Vander Weerdt. She wrote that she could not "move forward" without answers to those questions. *Id.*

### 5. Resignation

Later on May 1, Reyzer and Sagaitis spoke over the phone. The parties dispute the substance of that conversation. Reyzer says he told Sagaitis that

> there was never any consideration given to [her] or anyone else with respect to the position that Mike [Kapfer] took on as Director of Business Development, and [Reyzer] reiterated that there's no correlation between her wanting to travel or not that had anything to do with that because she wasn't considered and no one else was.· It was truly a reorganization and a position made for Mike.

Dkt. 32 (Reyzer Dep. 76:13–21). In response to questions about an alleged pay disparity between Sagaitis and Vander Weerdt, Reyzer says he "discussed some of the differences between [Vander Weerdt's] position and [Sagaitis's] role as NSI . . . senior product manager." *Id.* In her deposition, Sagaitis described the conversation as follows:

> [Reyzer] told me I was not considered for the role of business development because I was not qualified and that I was not given the job title and pay that I was asking for because I was being paid what I deserved and that I needed to agree to that, to quit asking those questions, agree to what he was saying in order to move forward.

Dkt. 36 (Sagaitis Dep. 95:5–11).

The call ended with Sagaitis telling Reyzer she was resigning. Later the same day, Sagaitis confirmed her resignation in an email to Reyzer, stating that she "cannot continue to feel like I work for an organization that does not value me or other women." Dkt. 26-19.

The court will provide additional facts as they become relevant to the analysis.

## ANALYSIS

### A. Overview of the claims and summary judgment standard

The court's first task is to determine the scope of Sagaitis's claims. Sagaitis asserts two theories: discrimination because of sex and retaliation for complaining about sex discrimination. But she does not clearly set forth in her amended complaint or her summary judgment brief precisely what conduct she is contending to be discriminatory or retaliatory.

In her amended complaint, Sagaitis alleged that West Bend's discriminatory actions "includ[ed]" the following: "demoting plaintiff, failing to promote her, failing to award her the job title and compensation at the level she deserved." Dkt. 3, ¶ 58. She alleged that West Bend's retaliatory actions "includ[ed]" the following: "defendant's removal of plaintiff's managerial job duties, demoting her, failing to consider her for a director's position, failing to compensate her at the level she deserved and constructively terminating her employment." *Id.* West Bend did not move to dismiss for lack of fair notice, but it did move to dismiss as untimely a claim that West Bend demoted Sagaitis in 2017 because of sex. In response, Sagaitis said

11

that she did not assert such a claim and that she included the references to the 2017 decision "for purposes of history, context, background, and a pattern evidencing West Bend's unlawful discriminatory intent." Dkt. 12, at 8. The only demotion Sagaitis said she was challenging was a February 2020 decision to remove some of her supervisory responsibilities. *Id.* So the court denied that aspect of the motion to dismiss as unnecessary. Dkt. 19, at 10.

Sagaitis's summary judgment brief, like her amended complaint, does not expressly identify which specific actions she is challenging. Instead, she refers generally to demotion, failure to promote, denial of equal pay, and constructive discharge, Dkt. 42, at 19–20, as she did in her amended complaint. But based on a wholistic review of the arguments in Sagaitis's brief, the court understands Sagaitis to be asserting that the following conduct was sex discrimination:

- After annual reviews in 2019, and 2020, West Bend failed to give her pay increases or a title that was commensurate with the work she was doing.

- In 2020, West Bend did not promote her to Director of Business Development.

- In 2020, West Bend removed Sagaitis's supervisory responsibilities.

These allegations can be synthesized into three types of claims: (1) unequal compensation; (2) failure to promote; and (3) demotion.

The court understands Sagaitis to be asserting that the following conduct was retaliation:

- In 2020, West Bend did not promote her to Director of Business Development, removed her direct reports, and excluded her from the executive leadership team after she alleged a pay disparity between her and a male employee.

- In 2020, Reyzer made statements that Sagaitis interprets as threatening to fire her if she did not stop complaining about sex discrimination.

These allegations can be synthesized into three types of claims: (1) failure to promote; (2) demotion; and (3) constructive discharge.

West Bend expresses some confusion in its opening brief about the scope of Sagaitis's claims, but West Bend does not contend that Sagaitis failed to provide fair notice of any of the claims identified above, and it addresses each of the claims in its briefs. So the court will consider those claims.

Sagaitis's brief also refers numerous times to the 2017 elimination of her position and subsequent transfer to a lower-ranking and lower-paid position. Dkt. 42, at 19, 25–27, 33, 42. She also refers to a removal of some supervisory responsibilities in 2018. *Id.* at 5. But she has already represented that she did not assert a claim for demotion other than what occurred in 2020, and she does not dispute West Bend's contention that a claim based on conduct from 2017 or 2018 would be untimely, so the court interprets all the references to the 2017 and 2018 decisions as background information. Sagaitis's alternative contention that West Bend should have created a new position for her when it eliminated her position is just another way of challenging her 2017 demotion, so the court will not consider that issue either.

If Sagaitis intended to raise any other claims, she forfeited them by failing to provide fair notice in her amended complaint or her summary judgment submissions about the scope of those claims.

West Bend moves for summary judgment on all of Sagaitis's claims. The question on a motion for summary judgment is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury

13

could find for the nonmoving party, after drawing all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

## B.  Discrimination

It is unlawful under Title VII for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C.A. § 2000e-2(a)(1). Sagaitis's claim can be broken into two elements: (1) West Bend subjected Sagaitis to a "disadvantageous" term or condition of employment, *Muldrow v. City of St. Louis, Missouri,* 601 U.S. 346, 354 (2024); and (2) West Bend's conduct was "because of" Sagaitis's sex. An employee is subject to a disadvantageous term or condition of employment when the employee suffers "some harm" because of a change in employment conditions. *Id.* at 350, 355. The employer's conduct occurs "because of" sex when the employee's sex "was a motivating factor for [the conduct], even though other factors also motivated the [conduct]." 42 U.S.C.A. § 2000e-2(m).

As already discussed, Sagaitis's discrimination claims fall into three categories: (1) failure to promote; (2) demotion; and (3) unequal compensation. Sagaitis also includes more general arguments about unequal treatment of women that the court will discuss at the end of the section on discrimination.

### 1.  Failure to promote

The court understands Sagaitis to be asserting two claims about a failure to promote her. First, from 2018 to 2020, while Sagaitis was the Senior Project Manager, she was performing the job duties of a director, but West Bend refused to recognize her as such because

of her sex. Second, West Bend did not promote her to Director of Business Development in 2020 because of her sex. On a motion for summary judgment, the question on disparate treatment claims like these is whether the plaintiff has adduced sufficient evidence to allow a reasonable jury to infer intentional discrimination based on a reason prohibited by Title VII. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016); *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (citation omitted).

### a.  Director of NSI Product Development

The court understands Sagaitis to contend that her responsibilities as the Senior Product Manager were the same or similar to the responsibilities she had while she was the Director of NSI Product Development between 2009 and 2014, so West Bend should have given her that title and corresponding salary. As previously discussed, Sagaitis disavowed any claim based on West Bend's decision to eliminate her job in 2017 and demote her to Senior Product Manager rather than create another director position for her. So the court understands Sagaitis's position to be that West Bend should have made her the Director of NSI Product Development after giving her positive evaluations in 2019 and 2020.

West Bend challenges this claim on two grounds: (1) a dispute over a title is not an adverse action that caused Sagaitis any harm; and (2) Sagaitis does not have evidence of discrimination. The court need not consider the first issue because it is not appropriate to view the job title dispute as a separate claim. Sagaitis's beef was not just about the job title, but also that she was performing the work of director without getting paid accordingly. So the court will consider these issues together as one claim. It is well established that a claim about a failure to promote to a higher paid position qualifies as an adverse term of employment under Title VII. *See Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020); *Hunt v. City of Markham,*

*Illinois*, 219 F.3d 649, 654 (7th Cir. 2000). So the court will not dismiss this claim on the ground that Sagaitis did not suffer a disadvantageous term or condition of employment.

The problem is that Sagaitis has not adduced evidence that any decision by West Bend in 2019 or 2020 not to promote her to Director of NSI Product Development was the result of sex discrimination. It is undisputed that West Bend chose not to refill the Director of NSI Product Development position after Sagaitis left that position in 2014. *See* Dkt. 43, ¶¶ 67, 85. That may suggest that West Bend did not value the position, but it is not evidence of bias against Sagaitis because she is female. Sagaitis identifies no additional duties that she took on between 2017 and 2020 that would justify reclassifying her position later. Rather, she says that she was performing director-level responsibilities the whole time. But even if West Bend was wrong not to classify Sagaitis's position as a director when it reassigned her in 2017, Sagaitis is not asserting such a claim in this case.

To support a claim that West Bend should have elevated her after positive performance reviews in 2019 and 2020, Sagaitis relies primarily on West Bend's decision in 2020 to create the Director of Business Development position for Kapfer.[2] Sagaitis contends that West Bend should have created a director-level position for her like it did for Kapfer and that its failure to do so is evidence of sex discrimination. The court will discuss in the next subsection West Bend's decision to give Kapfer the Director of Business Development position rather than

---

[2] Sagaitis also repeatedly alleges that West Bend broke its "promise" to restore her director level salary and title that she had before her demotion in 2017. Dkt. 42, at 3, 11, 19, 27, 29, 41. The evidence Sagaitis cites does not show that West Bend ever made an enforceable promise to Sagaitis. But even if it did, Sagaitis is not asserting a claim for breach of contract, and she does not explain how a broken promise is evidence of sex discrimination or retaliation. For example, she does not cite evidence that West Bend made similar representations to men and followed through with those promises.

Sagaitis. But regardless of whether Sagaitis should have received that promotion, she cannot rely on the creation of that position to show that West Bend should have created a Director of NSI Product Development for her. Again, any challenges to what happened in 2017 are outside the scope of this case.

In any event, the decision to demote an assistant vice president like Kapfer into a new position sheds no light on the reasons why West Bend chose not to promote Sagaitis in 2019 and 2020 to a director position that had been left open since 2014. The two decisions have too many differences to suggest Sagaitis and Kapfer were similarly situated in that context.

The court will grant summary judgment to West Bend on Sagaitis's claim that West Bend discriminated against her because of sex when it declined to promote her to the Director of NSI Product Development.

### b. Director of Business Development

In 2020, West Bend created a new position for Mike Kapfer called Director of Business Development. Sagaitis contends that she was more qualified than Kapfer for the job, and West Bend should have considered her. She says that much of the job overlapped with what she was already doing and that she also had experience with other aspects of the job related to traveling to build agency relationships.

For the purpose of its motion for summary judgment, West Bend does not dispute that Sagaitis was qualified for the job.[3] Instead, West Bend contends that there can be no sex

---

[3] Jacques (the Vice President of Commercial Lines) testified in his deposition that he did not consider Sagaitis for the job, but, even if he had, she would not have been qualified because the job required "relationship building," which was not one of Sagaitis's "strength[s]." Dkt. 29 (Jacques Dep. 35:19–25). But West Bend does not make the same assertion in its briefs or proposed findings of fact, so the court has not considered the issue.

17

discrimination because West Bend did not consider anyone, man or woman, except Kapfer for the job; it created the job especially for him because it believed he was struggling in his current job, and a job that focused on developing business relationships would play to his strengths. Dkt. 32 (Reyzer Dep. 46:5–47:11)). West Bend cites the statement in *Jones v. City of Springfield, Illinois* that a failure-to-promote claim requires "the existence of an open position." 554 F.3d 669, 673 (7th Cir. 2009).

*Jones* does not help West Bend. In that case, *no* employee was placed in the position that the plaintiff contended he should have been promoted to. *Id.* The court relied on straightforward logic to reject the plaintiff's discrimination claim: "If . . . no employee is promoted during the relevant time period, a failure-to-promote claim must fail because the claimant cannot argue that he was treated differently than anyone else." *Id.*

In this case, West Bend did fill the position at issue. An employer cannot insulate itself from a discrimination claim by contending that it considered only one person for the job. If that were the case, it would allow employers to promote employees through an informal, "tap on the shoulder" process that focused only on members of a favored group. The question is not whether others were considered for the promotion; it is whether other employees were excluded from consideration and did not receive the promotion because of a protected characteristic such as sex.

In a case in which the employer does not post a position before awarding a promotion, an employee can prove her claim with evidence that an employee outside her group received the position, the plaintiff would have applied for and accepted the position had it been offered to her, she was qualified for the position, and the reasons the employer gave for not choosing

18

her are pretextual. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 402 & n.2 (7th Cir. 2008). Sagaitis has provided such evidence.

Sagaitis made her wish to be promoted to a director position clear in numerous conversations with her supervisors between 2017 and 2020. As for Sagaitis and Kapfer's relative qualifications, West Bend says little about what the specific responsibilities of the new director position were, but it identifies two broad categories: (1) managing the product development department; and (2) creating new business by traveling to meet insurance agents. Dkt. 43, ¶ 104. It is undisputed that Sagaitis had previously managed the day-to-day operations of the product development department, and she had done a good job, consistently being rated as meeting or exceeding expectations. In fact, West Bend points to no deficiencies in her work. As for traveling to create new business, West Bend does not dispute Sagaitis's testimony that she had experience doing that as well. West Bend's position seems to be that Kapfer was better than Sagaitis at building relationships, but it doesn't support that belief with evidence.

As for pretext, West Bend says that it created the job for Kapfer because it would be a good fit for him, but West Bend does not explain why Kapfer was entitled to special treatment or why it did not consider anyone else. In the announcement for the new position, Reyzer stated that the company was creating a new unit to "drive new business to the underwriting teams through premium mining, through the development of new programs, and through product innovation to ensure that NSI remains a leader in the programs we write." Dkt. 39-1, at 4. This suggests that West Bend was trying to expand its business, not accommodate an employee. Why wouldn't West Bend want to find the most qualified candidate for that job? West Bend does not say.

The bottom line is this: Sagaitis has submitted evidence that she was qualified for the Director of Business Development, West Bend has not submitted evidence that Kapfer was more qualified than she was, and West Bend has not explained why it gave the job to a man without considering a potentially qualified woman. Simply stating, "We didn't consider anyone else" is not an explanation. From this, a reasonable jury could find that West Bend denied Sagaitis the promotion because of her sex.

The court will deny summary judgment on this claim.

### 2. Demotion

As part of the same restructuring that gave Kapfer the Director of Business Development position, two employees that had reported to Sagaitis would now report to Kapfer instead. West Bend also removed Sagaitis from an executive leadership committee. Sagaitis contends that those decisions were also discriminatory. West Bend objects to this claim on two grounds: (1) the removal of responsibilities does not qualify as an adverse action under Title VII; and (2) Sagaitis does not have evidence that West Bend removed responsibilities from her because of her sex.

The court overrules both objections for a similar reason. By West Bend's own assertion, the decision to place Kapfer in the Director of Business Decision and the decision to remove some of Sagaitis's responsibilities were both part of the same restructuring decision. Thus, for the purpose of determining whether West Bend subjected Sagaitis to an adverse action, it makes sense to consider the removal of responsibilities together with the failure to promote. As already discussed, a failure to promote is an adverse action under federal employment statutes when the promotion would come with more responsibility and higher pay, as this promotion would have. West Bend contends that the removal of responsibilities from Sagaitis

was simply a consequence of the decision to give the job to Kapfer. So the court need not decide whether the removal of responsibilities would qualify as an adverse action on its own.

Along the same lines, if the failure to promote and removal of responsibilities were part of the same decision, then it follows that the removal of responsibilities was discriminatory if the failure to promote was discriminatory. The court has concluded that a reasonable jury could find the promotion decision to be discriminatory, so the court will also deny summary judgment to West Bend on the claim that West Bend removed some of Sagaitis's responsibilities because of her sex.

### 3. Compensation

The court understands Sagaitis to be asserting three claims about discriminatory compensation: (1) she was paid less than male directors despite doing comparable work; (2) Vander Weerdt was paid more than her despite being her "counterpart"; and (3) several male employees received salaries that met or exceeded company guidelines for their positions, but Sagaitis's salary was below company guidelines despite receiving uniformly positive performance reviews.

When an employee contends that employees outside her group received more favorable treatment, the key question is whether the employee was similarly situated to the other employees she is comparing herself to. Two employees are similarly situated if they are "directly comparable . . . in all material respects so as to eliminate other possible explanatory variables." *Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 810 (7th Cir. 2025) (internal quotation marks).

### a. Directors

Sagaitis's claim that she was paid less than male directors fails for two reasons. First, Sagaitis was not classified as a director, and directors received higher pay at West Bend.

Sagaitis's claim that she should have been paid the same as a director is just a reframing of her argument that she should have been promoted to Director of NSI Product Development, which the court has already rejected. Second, Sagaitis did not propose any findings of fact about the relevant qualifications, experience, or responsibilities of any of the directors, so she cannot show that he was similarly situated to any of them.

### b. Vander Weerdt

Sagaitis contends that she should have been paid at least as much as Vander Weerdt because they had virtually the same job, except that her job was in the NSI division and his job was in the Commercial Lines division. The parties did not submit specific evidence about Sagaitis and Vander Weerdt's relative salaries at any given time, but it is undisputed that her pay grade was 209, and his was 210. Dkt. 44, ¶ 13. This claim fails because Sagaitis has not submitted evidence that Van Weerdt was similarly situated to her. Neither side submitted detailed evidence regarding the relative responsibilities that Sagaitis and Van Weerdt had, but it is undisputed that Van Weerdt had a different job in a different division and supervised 12 employees; Sagaitis supervised only 2. Dkt. 43, ¶¶ 61, 110. That alone would justify a pay disparity in the absence of other evidence of discriminatory intent, which Sagaitis has not provided.

In her proposed findings of fact, Sagaitis says that she and Vander Weerdt performed "comparable counter part duties," Dkt. 44, ¶ 34, but she does not support that allegation. She says that a "side-by-side comparison of [her and Vander Weerdt's] job descriptions demonstrate[es] the similarity of the roles," *id.*, but she neither submitted Vander Weerdt's job description as an exhibit nor identified all of his responsibilities. She testified about their similarities in the context of their joint projects, but she admitted that she had no personal

22

knowledge of what Vander Weerdt did on his other projects. Dkt. 28 (Sagaitis Dep. 55:4–12). She also cites Reyzer's desposition to support the proposition that she and Vander Weerdt were "counterparts," but Reyzer stated that he was not familiar with Vander Weerdt's responsibilities and could not compare them to Sagaitis's. Dkt. 32 (Reyzer Dep. 75:20–76:1).

It is Sagaitis's burden to show that an employee who received more favorable treatment is similarly situated to her. *See Smith v. Chicago Transit Auth.*, 806 F.3d 900, 907 (7th Cir. 2015). So Sagaitis' unequal pay claim based on a disparity with Vander Weerdt fails for a lack of proof. The court will grant West Bend's motion for summary judgment on this claim.

### c. Other male employees

Sagaitis contends that from 2017 to 2020 she was consistently paid less than what West Bend's own compensation manual recommended for someone in her pay grade while some men were paid more than the recommended amount, or at least a higher percentage than she was. In 2019, she says that Vander Weerdt was paid 105 percent of the recommended amount and Rob Maksimuk was paid 94.1 percent while she was paid 90 percent; in 2020, she says that Brent Haffenbredl was paid 108.6 of the recommended amount while she was paid 94 percent. Dkt. 44, ¶¶ 35–37. She also says that both Maksimuk and Haffenbredl had less experience than she did and did not supervise anyone. *Id.*

West Bend objects to this claim on the ground that Sagaitis did not provide notice of these other male comparators before filing her summary judgment submissions. The court need not consider that issue because there is another problem with this claim: the evidence Sagaitis cites in her proposed findings of fact to show how Van Weerdt, Maksimuk, and Haffenbredl's salaries compared to company recommendations is not readable. *See* Dkt. 44, ¶¶ 36–37 (citing Dkt. 41-4 and Dkt. 41-6). Even after West Bend objected that the documents were unreadable,

23

*see* Dkt. 44, ¶¶ 32–37, and the court gave Sagaitis an opportunity to provide readable versions of these documents, *see* Dkt. 47, Sagaitis failed to fix the problem or otherwise respond to the court's order. So this claim also fails for a lack of proof.

The court will grant West Bend's motion for summary motion on this claim.

### 4. Treatment of other female employees

In her brief and proposed findings of fact, Sagaitis discusses the experiences of other women at West Bend. In her proposed findings of fact, she makes the following assertions: (1) 17 of 21 directors from 1999 to 2020 were men, Dkt. 44, ¶ 53; (2) only one woman was an assistant vice-president during that time, *id.*; (3) another woman complained about "comments made by a male director" and expressed frustration that she had not been promoted to assistant vice president as some of her male colleagues had, *id.* ¶¶ 54–55. In her brief, she makes an additional assertion that only one female was on "the upper management team" when she left in 2020. Dkt. 42, at 37. Sagaitis does not rely on this information to support any one claim, but she frames it as evidence of a "broader pattern of gender discrimination" at West Bend. Dkt. 42, at 17.

West Bend objects to these assertions on the ground that they are not supported by evidence. But even if it is true that women were underrepresented in high-ranking positions at West Bend and that another woman believed she had been subjected to sex discrimination, that information is not helpful in isolation. A plaintiff in a Title VII case can support her claim in some instances with evidence that others in her group received less favorable treatment, *see Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir. 2008), but data points are not enough. Sagaitis must adduce evidence about why there is a statistical disparity or why other women were treated less favorably. In other words, she must show that women received less

favorable treatment than similarly situated men. *See Purtue v. Wisconsin Dept. of Corr.*, 963 F.3d 598, 603 (7th Cir. 2020). Sagaitis cites no evidence about who applied for any position, why West Bend made any other hiring or promotion decisions, or what the relative qualifications were for any male or female applicants. Without that context, the information Sagaitis cites does not prove discriminatory intent.

## C. Retaliation

An employer may not "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII.]" 42 U.S.C. § 2000e-3(a). A retaliation claim has three elements: (1) the employee engaged in statutorily protected activity; (2) her employer took an adverse employment action against her; and (3) the employer took the adverse action because of the employee's protected activity. *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 881 (7th Cir. 2014).

Both the injury and causation requirements are heightened for a retaliation claim. As for injury, the plaintiff must show that the employer's conduct was "harmful to the point that [the conduct] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). As for causation, the plaintiff must show that the employer would not have taken the adverse action but for the protected conduct. *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022).

The court understands Sagaitis to be raising two retaliation claims: (1) in 2020, West Bend chose not to promote Sagaitis to the Director of Business Development position and removed Sagaitis's supervisory responsibilities because she complained that Vander Weerdt

was being paid more than she was; and (2) later the same year, after Sagaitis complained about pay equity issues, Reyzer told her to stop complaining or leave.

### 1. Failure to promote and demotion

The parties agree that West Bend announced its decision to make Kapfer Director of Business Development the day after Sagaitis complained that Vander Weerdt was getting paid more than she was. Dkt. 32 (Reyzer Dep. 47:25–48:7). Both parties assume that Sagaitis's complaint about unequal pay qualifies as "oppos[ing]" sex discrimination and was therefore protected conduct under Title VII.

This claim fails on the element of causation. Sagaitis points to the short time period between her complaint and the announcement as evidence that West Bend was motivated by her complaint. But it is undisputed that the decision at issue "had been in the works for five to six weeks before Mr. Reyzer's conversation with Plaintiff about Mr. Kapfer's move into the Director of Business Development role." Dkt. 43, ¶ 99. Reyzer testified that "there were many steps that had to take place" before the change was approved and that the "decisions were all finalized before it was communicated." Dkt. 32 (Reyzer Dep. 48:7–49:14). Sagaitis cites no evidence that West Bend made an impromptu decision to deny her the promotion and remove her supervisory responsibilities because of her equal-pay complaint. A decision that was made before the employer's protected conduct occurred cannot be the basis for a retaliation claim.

Sagaitis also refers briefly in her proposed findings of fact to "raising compensation concerns with Reyzer" in 2018. Dkt. 44, ¶ 9. But she does not cite evidence either that the concerns she raised were about sex discrimination or that there was any connection between those concerns and a decision made two years later.

The court will grant summary judgment to West Bend on this claim.

## 2.  Constructive discharge

Sagaitis resigned from West Bend during her May 1, 2020 conversation with Reyzer. An employee's resignation generally is not an adverse action under Title VII. *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 235 (7th Cir. 2014). But there is an exception to the general rule if the resignation meets the standard for what the case law calls a constructive discharge. *Id*. That standard can be met in two circumstances: (1) the employer acted in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns; and (2) a plaintiff resigns due to discriminatory harassment. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679–80 (7th Cir. 2010).

In this case, Sagaitis contends that she can meet the first test. She says that she "believe[s]" she complained about sex discrimination during the conversation, Dkt. 36 (Sagaitis Dep. 96:2–5), and that Reyzer threatened to fire her if she kept complaining.

West Bend assumes for the purpose of summary judgment that Sagaitis made a complaint protected by Title VII during her conversation with Reyzer. Both sides also assume that an employer's threat to fire an employee for complaining about sex discrimination can qualify as a constructive discharge.[4] So the court need not consider those issues. But West

---

[4] The court of appeals has held that a constructive discharge may occur when the employee is presented with a "Hobson's choice in which the employee must resign or suffer severe consequences, such as facing criminal charges." *Ulrey v. Reichhart*, 941 F.3d 255, 261 (7th Cir. 2019). Neither side cites cases in which a court considered whether an employee is constructively discharged if the employer threatens to fire her for continuing to exercise her statutory rights. In *Chapin*, the court considered a similar issue, holding that an employee was not constructively discharged when the employer threatened to fire him if he did not withdraw an EEOC grievance but later "expressed a desire to keep [the plaintiff] on as an employee." 621 F.3d at 680–81 ("To find that one singular threat, followed by multiple reassurances that the employee has retained his job, was a constructive discharge is to lower the threshold of the 'intolerable' workplace so far as to be unrecognizable"). *Chapin* is distinguishable because West Bend does not contend that it made any similar reassurance to Sagaitis.

27

Bend contends that the constructive discharge claim fails for two other reasons: (1) Reyzer did not threaten to fire her for complaining; and (2) Sagaitis had already accepted a job with another insurance company before her conversation with Reyzer. The court agrees with the second contention, so it is unnecessary to consider the first.

Both sides assume that the constructive discharge claim fails if Sagaitis would have taken another job regardless of any threat by West Bend. Neither side cites any authority on the point, but the court of appeals made the same assumption in *Carr v. Allison Gas Turbine Division, General Motors Corp.*, when it stated in dicta that "the employer would not be liable" for constructive discharge under Title VII if the employee "would have quit anyway (or been fired) for reasons unrelated to" the employer's challenged conduct. 32 F.3d 1007, 1011–12 (7th Cir. 1994); *see also David v. Pointe Coupee Par. Sch. Bd.*, 247 F.3d 240 (5th Cir. 2001) (nonprecedential) (assuming that constructive discharge claim would fail if plaintiff accepted job offer from another company before employer's ultimatum to resign or be fired). This assumption makes sense because the question on a Title VII retaliation claim is whether the employee suffered an adverse action "because" she engaged in protected conduct under Title VII. If an employee leaves her job because she got a better one rather than because of an ultimatum by the employer, it follows that she was not discharged because of her protected conduct. Regardless, the court need not resolve the question because neither party raises it.

Sagaitis admits that she accepted a job offer with another insurance company on April 29, two days before her conversation with Reyzer. Dkt. 39 (Sagsaitis Decl. ¶ 18). But she says that summary judgment is not appropriate on this claim because she might have stayed at West Bend despite her acceptance of another job:

> I would have remained at West Bend had my pay equity concerns been resolved. My departure was caused by West Bend's years of

> unkept promises to me to adjust my pay grade and salary in accordance with their own compensation guidelines, and their sustained failure to act.

*Id.* This testimony does not help Sagaitis. Even if the court assumes that the testimony is true, it shows that Sagaitis left West Bend because she believed she was being underpaid, not because Reyzer threatened to fire her. Unequal pay can support a discrimination claim under Title VII, but it is not a basis for a constructive discharge claim. So the court will grant West Bend's motion for summary judgment on this claim.

## ORDER

IT IS ORDERED that West Bend Insurance Company's motion for summary judgment, Dkt. 23, is GRANTED in part and DENIED in part. The motion is denied on plaintiff Katie Sagaitis's claim that West Bend denied Sagaitis a promotion to Director of Business Development in 2020 because of her sex, in violation of Title VII of the Civil Rights Act. The motion is granted in all other respects, and Sagaitis's retaliation claims and other discrimination claims under Title VII are dismissed.

Entered April 10, 2026.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

29